**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ERNESTO M. LEAN,

       Plaintiff,

    vs.                                 Civ. No. 18-505 SCY

ANDREW SAUL, Commissioner of Social
Security,[1]

       Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>[2]**

      **THIS MATTER** is before the Court on the Social Security Administrative Record filed

September 4, 2018, Doc. 12, in support of Plaintiff Ernesto M. Lean's Complaint, Doc. 1,

seeking review of the decision of Defendant Andrew Saul, Commissioner of the Social Security

Administration, denying Plaintiff's claim for disability insurance benefits under Title II and Title

XVI of the Social Security Act, 42 U.S.C. § 401 *et seq*. On January 25, 2019, Plaintiff filed her

Motion To Remand For Payment Of Benefits, Or In The Alternative, For Rehearing, With

Supporting Memorandum. Doc. 21. The Commissioner filed a Brief in Response on March 18,

2019, Doc. 22, and Plaintiff filed a Reply on April 12, 2019, Doc. 23. The Court has jurisdiction

to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having

meticulously reviewed the entire record and the applicable law and being fully advised in the

premises, the Court finds the Motion is not well taken and is **DENIED**.

---

[1] Andrew Saul was sworn in as Commissioner of the Social Security Administration on June 17, 2019 and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings and to enter an order of judgment. Doc. 8.

## Background and Procedural Record

Claimant Ernesto M. Lean[3] suffers from the following severe impairments: pituitary macroadenoma; headaches; lumbar spine and cervical spine degenerative disc disease; bilateral bunions and hallux valgus; diabetes; psychosis, not otherwise specified; major depression, recurrent; PTSD; and methamphetamine abuse, in remission. Administrative Record ("AR") at 14. She alleges that she became disabled as of November 25, 2013. AR 11. She has a high school degree and completed two years of college for an associate's degree. AR 321, 1078. She has past work as a caregiver and a fry cook. AR 117-19.

On May 6, 2014, Ms. Lean filed a claim of disability under Titles II and XVI. AR 152. Her applications were initially denied on September 4, 2014, AR 152-53, and upon reconsideration on March 23, 2015, AR 170-71. Administrative Law Judge ("ALJ") James Bentley conducted a hearing on December 22, 2016. AR 108. Ms. Lean appeared in person at the hearing with attorney representative Don Smith. AR 108. The ALJ took testimony from Ms. Lean and an impartial vocational expert ("VE"), Amy Donaldson. AR 108.

On May 17, 2017, ALJ Bentley issued an unfavorable decision. AR 8. The Appeals Council denied review on April 21, 2018, noting that Ms. Lean submitted additional evidence but declining to consider it. AR 1-2. The ALJ's decision is the Commissioner's final decision for purposes of judicial review. Ms. Lean proceeded to federal court on May 31, 2018. Doc. 1. Because the parties are familiar with Ms. Lean's medical history, the Court reserves discussion of the medical records relevant to this appeal for its analysis.

_____

[3] The Motion explains: "Ernesto Lean has gender dysphoria and is male to female transgender. She prefers female pronouns, and some records refer to her by her preferred first name, ShaSha. However, if a medical record used the male pronoun, that pronoun will be used in describing the record to avoid confusion." Doc. 21 at 1 n.1. The Court will follow the same practice.

## Applicable Law

A.    Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also id.* § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential evaluation process ("SEP") to determine whether a person satisfies the statutory criteria as follows:

(1)    At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[4] If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2)    At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3)    At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4)    If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the

---

[4] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.* Gainful work activity is work activity that you do for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b).

most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)     If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).

The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

B.      Standard of Review

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias*, 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the

evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence "is 'more than a mere scintilla.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record," *Langley*, 373 F.3d at 1118, or "constitutes mere conclusion," *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). But where the reviewing court "can follow the adjudicator's reasoning" in conducting its review, "and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). The court "should, indeed must, exercise common sense." *Id.* "The more comprehensive the ALJ's explanation, the easier [the] task; but [the court] cannot insist on technical perfection." *Id.*

<u>**Analysis**</u>

In support of her Motion to Remand, Ms. Lean raises three main arguments. First, she argues that the ALJ erred at step four by improperly: assessing the effects of Ms. Lean's headaches; disregarding treating psychiatrist Dr. Nathaniel Sharon's opinion assigning a Global Assessment of Functioning ("GAF") score; rejecting the opinion of LASAC Don Smith, Ms. Lean's treating counselor; assessing Ms. Lean's social limitations; rejecting the opinion of Dr. Camellia Clark, consultative examiner; rejecting the opinion of PA Lucas Lujan, her treating physician assistant; and assessing Ms. Lean's subjective symptom evidence. Doc. 21 at 9-21. Second, she argues that the ALJ erred at step five by failing to resolve a conflict between the VE testimony and the Dictionary of Occupational Titles ("DOT"). Doc. 21 at 21-22. Finally, she argues that the Appeals Council should have considered her new evidence. Doc. 21 at 23-27. Ms. Lean argues for this Court to reverse and remand with instructions for the Commissioner to issue disability benefits; in the alternative, she requests a remand for rehearing. Doc. 21 at 27.

## I.     **The ALJ Did Not Err At Step Four.**

In assessing a claimant's RFC at step four, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, and review all of the evidence in the record. *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013). "[M]ost importantly, the ALJ's RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence." *Id.* (internal quotation marks and alterations omitted). "Requiring the ALJ to make specific findings on the record at each phase of the step four analysis provides for meaningful judicial review." *Winfrey v. Chater*, 92 F.3d 1017, 1025 (10th Cir. 1996).

Here, the ALJ found that, taking into account her severe impairments, Ms. Lean is capable of performing less than the full range of light work. AR 18. She requires a sit/stand

option and is limited to simple or detailed, but not complex, tasks. AR 4501. In her Motion, Ms.

Lean argues that this finding was error and that the ALJ should have found her disabled.

Although Ms. Lean identifies seven step-four errors which she discusses seriatim, the Court will

divide them into two categories: (1) the ALJ's consideration of medical evidence and (2) the

ALJ's consideration of medical opinions.

A.    The ALJ properly evaluated the medical evidence.

Ms. Lean argues that the ALJ improperly discounted medical evidence related to her

headaches, Doc. 21 at 9-11; her limitations on social functioning, Doc. 21 at 15-17; and her

subjective symptom evidence, Doc. 21 at 20-21. The Court finds that the ALJ's discussion of the

medical evidence was sufficient.

"The regulations require the ALJ to consider all evidence in the case record when he

makes a determination or decision whether claimant is disabled." *Keyes-Zachary v. Astrue*, 695

F.3d 1156, 1166 (10th Cir. 2012) (citing 20 C.F.R. § 404.1520(a)(3)) (internal quotation marks

and alterations omitted). An ALJ may not "pick and choose among medical reports, using

portions of evidence favorable to his position while ignoring other evidence." *Hardman v.

Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004). However, while "[t]he record must demonstrate

that the ALJ *considered* all of the evidence," he "is not required to *discuss* every piece of

evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (emphasis added). "Rather,

in addition to discussing the evidence supporting his decision, the ALJ also must discuss the

uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence

he rejects." *Id.*

To meet her burden in this Court, Ms. Lean must not only "point[] to evidence that she

claims the ALJ failed to discuss," but also "say why it was significantly probative." *Mays v.

Colvin*, 739 F.3d 569, 576 (10th Cir. 2014). The Court will not do so for her. *Id.*

1.     Headaches

At step two, the ALJ found that Ms. Lean's impairment of headaches is severe. AR 14.

At step three, he found that there is no listing for headaches and Ms. Lean's headaches do not

equal the listing for epilepsy or any other listing. AR 15. He discussed evidence that Ms. Lean

reported in 2016 that her headaches are generally unresponsive to medications and in 2015 that

her symptoms resolved after she took ibuprofen or went to sleep. *Id.* At step four, the ALJ

discussed her history with headaches based on medical evidence from 2014 to 2017. AR 19-20.

He remarked that "during a February 11, 2017 emergency room visit, she reported that after she

was diagnosed with a brain tumor, she had noticed worse headaches, worse blurry vision, and

some right lower extremity weakness" and "[s]he rarely, if ever, complained of headaches after

this until diagnosed with pituitary tumor." AR 20.

> She underwent multiple CT head/brain scans, which were normal. The scans
> showed no evidence of intracranial mass or hemorrhage to suggest an etiology to
> her chronic headaches. She had no focal neurological deficits, no evidence to
> suggest meningitis, and no evidence of temporal arteritis or sinusitis or acute
> infection. Moreover, her history did not suggest a subarachnoid hemorrhage.

AR 20 (citations omitted). The ALJ concluded:

> Based on the above-discussed medical evidence, I find that she is limited to
> performing, at most, a range of "light" work, noting this is consistent with her
> report of being able to lift 25 pounds prior to January 30, 2017 motor vehicle
> accident (with no abnormal finding other than tenderness after the accident) and
> her report that she can walk one to two miles slowly. She also reported she can sit,
> but not for a long time. I find that her physical impairments warrant not only
> occasional postural limitations, but also a sit/stand option, with the parameters
> enumerated above, to allow her to change positions in order to relive discomfort,
> but without leaving the workstation so as not to diminish pace or production.
> Though she only intermittently endorsed orthostatic dizziness and exhibiting no
> difficulties balancing on examination, I find it reasonable that due to complaint of
> dizziness she must avoid unprotected heights and dangerous moving machinery. I
> note, finally, that the newly received medical evidence indicates no additional
> limitations [from] her pituitary macroadenoma surgery other than post-operative
> limits that are not expected to last 12 months.

AR 26-27.

Ms. Lean challenges the entirety of this finding. She argues that "ALJ Bentley ignored the longitudinal and consistent evidence of Ms. Lean's headaches, and failed to include resulting limitations on her ability to function." Doc. 21 at 9. Ms. Lean contends that the ALJ ignored relevant medical evidence showing that her headaches were severe prior to her diagnosis of a brain tumor. *Id.* at 10. She argues that the ALJ reached his conclusion by "picking and choosing random evidence." Doc. 21 at 10. She argues that the result of this error was to improperly disregard "the occupational effects of Ms. Lean's headaches" such as "memory problems, blurry vision, and confusion." *Id.* at 11.

Ms. Lean identifies three specific pieces of evidence she contends the ALJ should have considered:

- Ms. Lean complained of headaches at least 11 times prior to February 24, 2016 (citing AR 499-500, 478-81, 492-93, 635-39, 576-78, 674, 624-26, 1078-79, 908-13, 932-35);

- A January 2017 visit at which Ms. Lean told PA Lucas Lujan that she had recently been to the ER with a headache and blurred vision and that she had headaches "all the time now" (citing AR 1569);

- Dr. Nathaniel Sharon's medical opinion on August 25, 2016 that Ms. Lean had "memory, cognitive and psychotic disturbances from pituitary enlargement" (citing AR 1254);

Doc. 21 at 10.

The Court finds that this is not significantly probative evidence that the ALJ ignored. To the contrary, the ALJ specifically acknowledged these first two pieces of evidence and cited much of the same record evidence that Ms. Lean cites:

- "On January 9, 2015, she had presented to the emergency room for complaint of headache" . . . . "Prior to this, the claimant had presented to the emergency room on multiple occasions in March through May 2014 for headache complaints" . . . . "[T]he attending physician on the last visit, dated May 30, 2014, noted that she had made 'multiple vague neurologic complaints including headache and blurry vision even predating the [April 23, 2014] car accident.'" AR 20 (citing AR 850-51, 1178-83, 576-79, 623-27, 634-40 & 625).

- "On January 27, 2017, she told her treating physician assistant Lucas Lujan that she had headaches all the time now" and she discussed with him "a January 20, 2017 emergency room visit" where she disagreed that "the worst headache of her life" was just "experiencing a migraine." AR 20 (citing 1537-40, 1544-52, 1558-65 & 1569).

Because the ALJ did *consider* this evidence, Ms. Lean's argument is really one of failure to properly *weigh* the evidence. The Court does not reweigh evidence in the ALJ's place; it determines whether the ALJ's opinion is supported by substantial evidence. Here, the ALJ's decision is supported by substantial evidence. The ALJ acknowledged Ms. Lean's complaints of headaches to her providers. However, he chose to give those complaints less weight than Ms. Lean's multiple normal CT scans and the fact that no medical evidence in the record suggested an etiology to her complaints of chronic headaches. AR 20. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. [The court] may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). The ALJ's discussion is sufficient on these points.

As for the third piece of evidence Ms. Lean points to, the Court agrees that the ALJ did not specifically discuss treating psychiatrist Dr. Sharon's August 25, 2016 statement that Ms. Lean had "memory, cognitive and psychotic disturbances from pituitary enlargement." *Cf.* Doc. 1 at 10 (citing AR 1249-54). Instead, the ALJ mentioned this visit only to note that Dr. Sharon took over Ms. Lean's medication management, continuing some medications and altering another. AR 25. The Court does not agree, however, that anything in these treatment notes constitutes specifically probative evidence the ALJ was required to discuss.

The statement in question provides in full: "I am concerned there are some memory, cognitive and psychotic disturbances from pituitary enlargement and will also need to work

closely with endocrine." AR 1254. There are no non-speculative statements in this treatment note assigning limitations which the ALJ was required to discuss. *Paulsen v. Colvin*, 665 F. App'x 660, 666 (10th Cir. 2016) (the ALJ did not have to assign a specific weight to a doctor's statement that the claimant "*probably* has difficulty with concentration and remembering because of attention problems" because the doctor did not assign any functional limitations); *see Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164 (10th Cir. 2012) (the ALJ was not required to assign a weight to "observations" that do not "offer[] an assessment of the effect of [the claimant]'s mental limitations on her ability to work," especially where "[t]he file includes much more directly relevant evidence on these issues"); *Cowan v. Astrue*, 552 F.3d 1182, 1189 (10th Cir. 2008) (statement regarding what a doctor does not know is not "a true medical opinion"); *Blazevic v. Colvin*, No. 14-2394, 2015 WL 5006139, at *10 (D. Kan. Aug. 20, 2015) (physician's statement that "I am very concerned about [claimant]'s ability to maintain steady employment at the present time due to his symptomatology" was "not an opinion" as it expresses "uncertainty regarding [claimant]'s ability, rather than his opinion that [claimant] can or cannot maintain steady employment"). Dr. Sharon is a psychiatrist, not a neurologist, and nowhere in the pages cited by Ms. Lean does he offer an opinion about her functional limitations due to headaches specifically. AR 1249-54.

Ms. Lean also argues that the combined evidence of her headaches is significantly probative because "when considered in its entirety, the medical records reveal the occupational effects of Ms. Lean's headaches," such as "memory problems, blurry vision, and confusion." Doc. 21 at 11. Again, however, the ALJ thoroughly discussed Ms. Lean's blurry vision (at the top of AR 21), making findings which Ms. Lean does not otherwise challenge. The ALJ also discussed her complaints of memory loss (beginning on the bottom of AR 25 and continuing on

AR 26), and specifically gave only partial weight to the opinions of state agency psychologists because he found greater limits on memory, attention, and concentration were supported by the record (AR 28). The ALJ's opinion clearly demonstrates that he did not ignore any of these symptoms. This Court's role is not to re-weigh the evidence. *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir 2007). Of course, the Court may overturn the ALJ if his decision "is overwhelmed by other evidence in the record," *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004), or if he "mischaracterizes" evidence, *Talbot v. Heckler*, 814 F.2d 1456, 1464 (10th Cir. 1987). But the Court does not find the evidence cited by Ms. Lean to be so overwhelming such that the ALJ's opinion lacks substantial evidence, and Ms. Lean does not point to any evidence that the ALJ mischaracterized or misapprehended in finding that her headaches do not prevent her from performing light work.

In reply, Ms. Lean additionally relies on *Lauer v. Commissioner*, in which the Tenth Circuit remands because "the ALJ did not analyze Ms. Lauer's complaint about near-daily migraine headaches at any step of his analysis." 752 F. App'x 665, 667 (10th Cir. 2018); *see* Doc. 23 at 2. In *Lauer*, the ALJ concluded that the claimant did not have headaches without explaining why. *Id.* This decision thus has little relevance to this case, where the ALJ did consider whether Ms. Lean's headaches are a disabling impairment and explained (at length) why they are not.

2.     Social functioning

The ALJ's RFC limited Ms. Lean to "occasional contact with coworkers, supervisors, and the general public." AR 18. Ms. Lean argues that this limitation is not restrictive enough. Doc. 21 at 15. Ms. Lean asserts that the activities the ALJ relied on to reach this finding—her "ability to use public transit, independent functioning in her activities of daily living, and her

ability to go shopping and to a casino"—do not constitute evidence that she can interact with others in the workplace. Doc. 21 at 15-16.

In support of her argument, Ms. Lean relies on various medical evidence of record. Ms. Lean first argues that the ALJ should have interpreted her November 2016 casino trip to be evidence of psychiatric problems rather than proof that she can function socially. Doc. 21 at 16. She emphasizes that Ms. Lean reported to Dr. Sharon that, during the casino trip in question, she suffered hallucinations and suicidal thoughts. *Id.*; AR 1237-38. Again, however, the ALJ demonstrated that he considered—and weighed—this same evidence. *See* AR 24 ("The claimant also endorsed auditory and visual hallucinations at times, such as hearing voices having conversations, strange noises while listening to the radio, and seeing shadows at night." (citing AR 1255)); AR 25 ("[S]he reported improved psychosis, and described her hallucinations as only occasionally hearing her brother-in-law yell at her when no one is there, and sometimes seeing shadows." (citing AR 1587)); AR 24 ("Beginning on August 25, 2016, treating psychiatrist Dr. Nathaniel G. Sharon, M.D., to whom the claimant had first presented on February 4, 2016 for hormone replacement therapy, found the claimant to be positive for chronic suicidal ideation, but without intent or plan and with denial of nonsuicidal self-injurious behaviors." (citing AR 1237, 1246 & 1253)). After discussing this evidence, the ALJ discounted it, noting that "since establishing mental health care, [Ms. Lean] has consistently denied delusions, ideas of reference, paranoid ideation, or grandiosity." AR 24 (citing AR 1238,[5] 1246, 1342 & 1587). Substantial evidence supports this determination, so the Court does not reweigh this evidence.

---

[5] The ALJ cited to "Exhibit 23F/102," although the relevant information appears on page 103 of Exhibit 23F, *i.e.*, AR 1238.

Ms. Lean also challenges the ALJ's finding that she had pleasant and cooperative interactions with providers. Doc. 21 at 16. The ALJ relied on medical reports stating Ms. Lean was cooperative (citing AR 493, 593-94, 846, 871, 900, 1073, 1078, 1107, 1240, 1342 & 1533), pleasant (citing AR 594, 1246 & 1590), calm (citing AR 871 & 1078), friendly (citing AR 1078 & 1200[6]), easy to engage (citing AR 588), and had eye contact that was good or within normal limits (citing AR 588, 900, 980, 1078, 1246, 1342 & 1590). *See* AR 17.

Ms. Lean challenges these findings by pointing to treatment records in which providers note that she is anxious and tearful. *Id.* (citing AR 492-93, 635-39, 680, 867-74, 898, 1072-74 & 1146-48). Again, the ALJ neither ignored nor mischaracterized any of this evidence. The ALJ specifically discussed Ms. Lean's anxiety in the course of several pages of analysis pertaining to psychological impairments (AR 24-26). In fact, the ALJ discussed and cited many of the very same treatment records Ms. Lean claims he "omitted." For instance:

- "[S]he reported increased anxiety depression and paranoia following a series of distressing events . . . ." AR 24 (citing AR 574, 588, 703, 840, 845 & 1078).

- "On August 29, 2016, she asked Mr. Lujan about service dogs due to anxiety/ depression, but was otherwise stable." AR 25 (citing AR 1220).

- "On August 26, 2014, she underwent a State Agency mental status examination conducted by Dr. Camellia Clark, M.D. She described her mood as 'anxious.'" AR 25 (citing AR 680).

- "On a few occasions, she was tearful when discussing her history." AR 26 (citing AR 1073 & 1257).

Clearly, the ALJ did not ignore significantly probative medical evidence.

---

[6] The ALJ cited to "Exhibit 23F/64," although the relevant information appears on page 65 of Exhibit 23F, *i.e.* AR 1200.

Ms. Lean then attempts to support her argument that substantial evidence fails to support the ALJ's decision through citation to *Groberg v. Astrue*, 505 F. App'x 763 (10th Cir. 2012) (remanding with instructions to award EAJA fees).[7] In *Groberg*, the Tenth Circuit found that one doctor's appointment "is hardly solid evidence that Mr. Groberg had achieved any long-term stability on his medications." 505 F. App'x at 769. To the contrary, "Mr. Groberg experienced many ups and downs in his condition." *Id.* The Tenth Circuit stressed "that the ALJ concluded these ailments would pose *no* limit on Mr. Groberg's ability to work," a conclusion which was "seriously deficient" and "unsupported by substantial evidence." *Id.*

*Groberg* is not on point. Unlike *Groberg*, the ALJ here both: (1) pointed to more than one doctor visit noting controlled or improved symptoms, and (2) included highly restrictive limitations on social interactions in the RFC. He limited Ms. Lean to only occasional contact with others, and the VE testified that the jobs she identified were, in her experience, consistent with the limitations on exposure to supervisors, coworkers and the public. AR 18, 121. *Groberg* does not address whether those limitations would be sufficient for someone in Ms. Lean's position.

Ms. Lean also argues that the cited activities are so "minimal" that they cannot constitute substantial evidence in support of the ALJ's evaluation. Doc. 21 at 17. She relies on *Thompson v. Sullivan*, in which the Tenth Circuit found that "minimal daily activities such as visiting neighbors and doing light housework" are not substantial evidence of non-disability. 987 F.2d 1482, 1489-90 (10th Cir. 1993). *Thompson* held that the two-item list of daily activities in that case provided insufficient grounds for the ALJ to find that the claimant's complaints of pain

---

[7] Ms. Lean also cites an earlier Tenth Circuit decision involving the same parties: *Groberg v. Astrue*, 415 F. App'x 65 (10th Cir. 2011) (remanding for an award of benefits).

were not credible. *Id.* at 1489. But *Thompson* did not discuss whether social activities outside the home constitute evidence that a claimant need not be restricted from all contact with the public. Thus, *Thompson* is of little help here.

Moreover, the evidence the ALJ cited here is more substantial than the two-item list at issue in *Thompson*. AR 28. In addition to the evidence discussed above, *supra* pp. 13-14, the ALJ observed that Ms. Lean stated in her own adult function report that she has no difficulty getting along with others. AR 17, 339. She reported being able to take public transportation independently and shopping in public venues, and she interacted appropriately with the claims representative when filing her social security application. AR 28. The ALJ also relied on a finding by Dr. Camelia Clark, consulting psychiatrist, who found in August 2014, that "[s]ocial interaction with this evaluator was normal." AR 17, 680. This is substantial evidence supporting the ALJ's decision.

Again, Ms. Lean's argument amounts to a request for this Court to reweigh conflicting medical evidence in place of the ALJ. As discussed above, that is not this Court's role; the Court's role is to determine whether the ALJ's opinion is supported by substantial evidence. *White v. Barnhart*, 287 F.3d 903, 909-10 (10th Cir. 2002); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992) (in determining whether substantial evidence existed, the court cannot reweigh the evidence or substitute its judgment for the ALJ's); *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1172 (10th Cir. 2012) ("The ALJ, however, was free to resolve evidentiary conflicts because there is substantial evidence to support his conclusion."). Substantial evidence supports the ALJ's decision because the evidence of Ms. Lean's limited social functioning does not overwhelm the evidence in the record that the ALJ relied on.

3.    Subjective symptom evidence

Social Security Ruling ("SSR") 16-3p[8] instructs ALJs "to consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms." 2017 WL 5180304, at *2. In evaluating whether a claimant has disabling pain, the reviewing court considers whether the claimant has proffered objective medical evidence of a pain-producing impairment; if so, whether there is a loose nexus between the claimant's subjective allegations of pain and the impairment; and if so, whether the claimant's pain is in fact disabling, considering both objective and subjective evidence. *Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993) (citing *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987)). "A claimant's subjective allegation of pain is not sufficient in itself to establish disability." *Id.*

The ALJs' assessments of subjective symptom complaints "warrant particular deference." *White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2002). While the Tenth Circuit has "insisted on objectively reasonable explanation over mere intuition," it has "not reduced [subjective symptom] evaluations to formulaic expressions." *Id.* at 909. The courts do not "'require a formalistic factor-by-factor recitation of the evidence.'" *Id.* (quoting *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)). The ALJ need only "set[] forth the specific evidence he relies on in evaluating the claimant's" subjective symptom evidence. *Id.* "Findings as to [subjective

---

[8] SSR 16-3p is applicable for decisions made on or after March 28, 2016, and superseded SSR 96-7p. *See* 2017 WL 5180304, at *13 n.27. SSR 16-3p eliminated the use of the term "credibility," in order to clarify that subjective symptom evaluation is not an examination of [a claimant's] character." *Id.* at *2. The substantive instructions in both rulings are the same, so case law interpreting SSR 96-7p remains relevant. *See Paulek v. Colvin*, 662 F. App'x 588, 593-94 (10th Cir. 2016); *Brownrigg v. Berryhill*, 688 F. App'x 542, 545-46 (10th Cir. 2017).

symptom evidence] should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted).

In this case, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." AR 19. While this sentence is boilerplate, it is followed by nine full pages of non-boilerplate review of the evidence of record, roughly half of which is a discussion of her physical symptoms. AR 20-28. Nonetheless, Ms. Lean claims that the ALJ did not consider the required factors under SSR 16-3p, "such as Ms. Lean's persistent attempts to find pain relief, her willingness to try treatments prescribed, regular contact with a doctor, daily activities, and the dosage, effectiveness, and side effects of medication." Doc. 21 at 20. She also argues that he should have relied on "objective findings such as tenderness to palpation, muscle spasms, leg weakness, and walking with a limp, which led Dr. Ponce to prescribe muscle relaxers, and Dr. Cabrera to administer steroid injections and refer Ms. Lean to a pain clinic." *Id.*

Ms. Lean is correct that the ALJ should *consider* these items, but the implication of her argument—that the ALJ had to *credit* them—is wrong. The ALJ did not make any findings that Ms. Lean was not working with her doctors or not following prescribed treatments. Rather, he recognized—over the course of nine pages—that she had regular contact with a great many doctors. He considered her medications at length for four-and-a-half pages. AR 20-24. He discussed all the items Ms. Lean claims he ignored: her muscle tenderness, AR 21, 23; Dr. Cabrera's administration of trigger point injections, AR 21; her leg weakness, AR 21; her care

with a pain management clinic, AR 22, 23; PA Lujan's observation once that she walked with a limp, AR 22; and her prescription for muscle relaxers, AR 22. And while Ms. Lean complains about the ALJ's discussion of her daily activities, she does not specifically dispute the ALJ's finding that on July 21, 2016, she reported to her provider "that she was starting to do more physical activity, and reported getting 30 minutes of exercise per day, including walking, running, weight lifting, yoga, and sports." AR 23. Nor does she deny that "[s]he reported in her initial level adult function report that her hobbies including walking, and reported on January 17, 2017 psychosocial assessment at New Mexico Solutions for fun she watches television, prays, feeds the ducks, and walks." AR 23. Ms. Lean has thus failed to show that the ALJ's determination lacks substantial evidence.

Ms. Lean relies on *Hamlin v. Barnhart*, in which the Tenth Circuit reversed because the ALJ gave three unfounded reasons for rejecting the claimant's subjective symptom evidence. 365 F.3d 1208, 1221 (10th Cir. 2004). First, the Tenth Circuit found that watching television is not a substantial activity of daily living that an ALJ can rely on for a finding of non-credibility in the absence of a medical opinion on the topic. *Id.* Second, an ALJ cannot rely on "minor" discrepancies in a claimant's hearing testimony. *Id.* Third, an ALJ cannot rely on failure to follow medical treatment options where there is no evidence those options were prescribed for the claimant by a doctor. *Id. Hamlin* has no applicability to this case, where the ALJ did not rely on any of these three lines of reasoning. Although the ALJ mentioned television watching, it was in conjunction with other, much more substantial activities of daily living. AR 23. Further, the Court finds that the ALJ did not rely on "minor discrepancies" in claimant's hearing testimony or rely on a failure to follow medical treatment options.

To the extent Ms. Lean argues generally that the ALJ's discussion in AR 20-24 lacks substantial evidence, and does not bring a more specific challenge to these findings in other sections of her motion, she has not sufficiently developed any such argument. *See Tietjen v. Colvin*, 527 F. App'x 705, 709 (10th Cir. 2013) (arguments raised in a perfunctory manner are waived) (citing *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002)). The Court must affirm.

B.    The ALJ properly evaluated the medical opinions.

The ALJ is required to evaluate every medical opinion he receives that could have an effect on the RFC. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161-62 (10th Cir. 2012); *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003). For claims filed before March 27, 2017,[9] as the present claim is, medical opinions are classified into two different categories: "acceptable medical sources" and "other sources." "Acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939, at *1; SSR 96-2p, 2017 WL 3928298. "Other medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. SSR 06-03p, 2006 WL 2329939, at *2; SSR 96-2p, 2017 WL 3928298.

"Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." SSR 06-03p, 2006 WL

---

[9] For claims filed on or after March 27, 2017, all medical sources can provide evidence that is considered opinion evidence and subject to the same standard of review. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).

2329939, at *2 (Aug. 9, 2006). Information from "other sources," both medical and non-medical, are used to "show the severity of an individual's impairment(s) and how it affects the individual's ability to function." *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citing 20 C.F.R. § 416.902); *see* SSR 06-03p, 2006 WL 2329939, at *2.

A unique two-step rule applies to the opinions of treating physicians (acceptable medical sources who provide or have provided the claimant with medical treatment and who have an ongoing relationship with the claimant). First, the ALJ must determine whether the opinion is entitled to "controlling weight." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). An ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) "consistent with other substantial evidence in the record." *Id.* (internal quotation marks omitted). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Id.* If it is not given controlling weight, "at the second step in the analysis, the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330.

The factors in the regulation are:

(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)).

The ALJ is not, however, required to "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Rather, the decision need only be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (internal quotation marks omitted). The Tenth Circuit has also expressed this as a requirement that the ALJ provide "specific and legitimate reasons" for rejecting an opinion. *Doyal*, 331 F.3d at 764; *Watkins*, 350 F.3d at 1301. The ALJ's reasons are reviewed for substantial evidence. *Doyal*, 331 F.3d at 764.

Ms. Lean argues that the ALJ erred by rejecting treating psychiatrist Dr. Nathaniel Sharon's assignment of a GAF score of 49; rejecting the opinion of Don Smith, Ms. Lean's treating counselor, assessing Ms. Lean's social limitations; partially rejecting the opinion of Dr. Camellia Clark, consultative examiner; and rejecting the opinion of PA Lucas Lujan, her treating physician assistant. The Court considers each argument in turn.

1.     GAF score assigned by Nathaniel Sharon, M.D., treating psychiatrist

Ms. Lean argues that the ALJ improperly evaluated the assignment of a Global Assessment of Functioning ("GAF") score by Dr. Nathaniel Sharon, a psychiatrist at UNM. Doc. 21 at 11-14. The GAF score "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" *Langley v. Barnhart*, 373 F.3d 1116, 1123 n.3 (10th Cir. 2004) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000)). "A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning, such as inability to keep a job." *Id.* (internal quotation marks and alterations omitted). "The Commissioner has declined to endorse the use of GAF scores for use in disability determinations, concluding they have no 'direct correlation to the severity requirements' of the

mental disorders listings." *Watts v. Berryhill*, 705 F. App'x 759, 762 (10th Cir. 2017) (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000)).

It is not clear from published Tenth Circuit case law whether GAF scores represent an opinion that the ALJ must evaluate. *Compare Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162-63 (10th Cir. 2012) (failing to assign a weight to consultative examiner's GAF score of 65 was harmless error); *id.* at 1164-65 (failing to assign a weight to therapist's GAF score of 46 was "[o]f more concern" but ultimately also harmless because "[t]his low GAF score is inconsistent with other GAF evidence in the record" and was assigned by a non-acceptable medical source); *Langley v. Barnhart*, 373 F.3d 1116, 1122-23 (10th Cir. 2004) (relying on GAF scores and other opinion/medical record evidence to reverse the ALJ's rejection of a doctor's opinion as inconsistent); *Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007) (affirming the ALJ's assignment of little weight to a treating physician's opinion including in part a GAF score where "there is no explanation in the letter why Dr. Stanley assigned Mr. Pisciotta a GAF score of 45"). In prior decisions, this Court has acknowledged that "[j]ust how much weight an ALJ should give to GAF scores has been subject to significant debate," and also indicated that "standing alone, a low GAF score does not necessarily indicate an impairment seriously interfering with a claimant's ability to work because a claimant's impairment, for example, might lie solely within the social, rather than the occupational, sphere." *Montoya v. Colvin*, No. 14-1148 SCY, 2016 WL 2956225, at *7 (D.N.M. Apr. 14, 2016) (internal quotation marks and alteration omitted). For purposes of this case, the Court will assume that the ALJ had a duty to evaluate the GAF score and provide reasons for his evaluation supported by substantial evidence, because the ALJ did so here.

Dr. Sharon assessed a GAF of 49 on December 1, 2016. AR 1240. The ALJ noted that he did not "explain[] the reasons behind th[is] GAF score[] or the period to which [it] applied." AR 27. "As such, th[is] GAF score[] do[es] not provide a reliable longitudinal picture of the claimant's mental functioning for the purposes of a disability analysis." *Id.* "I give partial weight to the GAF scores between January and March 2015, as this was around the time the claimant went inpatient. However, I give diminished weight to the other GAF scores [including Dr. Sharon's] . . . because the degree of limitation suggested by those GAF scores is inconsistent with the claimant's report of improvement in symptoms with treatment, the mental status examination findings, and the no more than 'moderate' limitations in the four domains of functioning, as discussed above and incorporated herein by reference." *Id.*

The Court finds that these are legitimate and specific reasons for disregarding Dr. Sharon's December 1, 2016 GAF score. In particular, published Tenth Circuit case law supports the ALJ's rejection of the GAF score on the basis that it is unexplained. *Pisciotta*, 500 F.3d at 1078 (affirming the ALJ's assignment of little weight to a treating physician's opinion including in part a GAF score where "there is no explanation in the letter why Dr. Stanley assigned Mr. Pisciotta a GAF score of 45"); *see also Montoya*, 2016 WL 2956225, at *7. Normal findings on mental status examination likewise represent legitimate evidence of a claimant's mental functioning. *E.g.*, *Beasley v. Colvin*, 520 F. App'x 748, 752 (10th Cir. 2013); *Adcock v. Commissioner*, 748 F. App'x 842, 846 (10th Cir. 2018).

Ms. Lean argues in her motion that Dr. Sharon's mental status examinations, in addition to "his findings of auditory and visual hallucinations, poor memory, and a high, chronic risk of harm to herself/others" are, contrary to the ALJ's reasoning, in fact consistent with a GAF of 49. Doc. 21 at 11-12. She argues that the ALJ should not have relied on "occasional symptom

improvement" and contends that the ALJ neglected to cite any evidence contrary to Dr. Sharon's GAF score. Doc. 21 at 13-14. None of these arguments are persuasive. At most, Ms. Lean identifies evidence that could be consistent with the GAF score. This is different than showing, as she must to succeed, that the ALJ's identification of inconsistent evidence—and resultant diminished weight given to the GAF score—lacks substantial evidence.

First, the ALJ did not ignore, but rather specifically acknowledged, Ms. Lean's audio/visual hallucinations. AR 24-25. Therefore, once again, Ms. Lean's challenge is really to the weight the ALJ gave this evidence. The Court does not agree that Dr. Sharon's findings of audio/visual hallucinations constitute overwhelming evidence of disability such that they undermine the ALJ's weighing of the evidence. For instance, Dr. Sharon noted that the auditory and visual hallucinations came from Ms. Lean's own reports, *see* AR 1240 (audio/visual hallucinations "per HPI [history of present illness]"), and he also repeatedly noted that Ms. Lean is an unreliable and limited historian or source of information, AR 1240, 1243, 1250, 1254, 1262, 1580, 1587. Dr. Sharon does not discuss the hallucinations in any of his assessments or other medical opinions, much less assign any functional limitations resulting from them. *See Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009) (opinion of treating physician properly rejected where, among other things, his treatment notes "simply recite Mr. Raymond's complaints" and "provide little analysis").

Second, the ALJ did not misconstrue Dr. Sharon's mental status examinations or ignore his evaluation of Ms. Lean's memory problems. Instead, the ALJ considered Dr. Sharon's mental status examinations *as well as* the mental status examinations providers other than Dr. Sharon performed. AR 25-27. To the extent Ms. Lean addresses only Dr. Sharon's mental status examinations, she has failed to fully challenge the ALJ's finding.

Furthermore, Dr. Sharon's mental status examinations are not as conclusive as Ms. Lean implies. Rather, they are a mixed bag of mostly normal findings with some exceptions.[10] For example, Dr. Sharon sometimes found she had poor memory and sometimes found it normal. AR 1265, 1253, 1246, 1240, 1290 & 1583; *see supra* note 9. The ALJ discussed Ms. Lean's memory problems at length. AR 25-26. Although he did not completely defer to Dr. Sharon, neither did he defer to the opinions of the state agency psychologists—he gave their opinions only partial weight, placing greater limits on Ms. Lean's memory, attention, and concentration than did these psychologists. AR 28.

Next, contrary to Ms. Lean's assertion, Dr. Sharon did not find that Ms. Lean was at "high" chronic risk of harm to self or others. *Cf.* Doc. 21 at 12. Instead, he consistently found that Ms. Lean was at "moderate" chronic risk of harm to self/others and at "low" acute risk.[11] AR

---

[10] Dr. Sharon's mental status examinations evaluated Ms. Lean's speech, thought process, associations, abnormal or psychotic thoughts, judgment and insight, orientation, recent and remote memory, attention span and concentration, language, fund of knowledge, and mood and affect. All categories were normal on February 4, 2016. AR 1265. All categories were normal on other visits except as follows. On August 25, 2016, Dr. Sharon noted audio/visual hallucinations, trauma-related olfactory disturbances, and chronic suicidal ideation without intent/plan. AR 1253-54. On September 8, her thought process was mildly disorganized but concrete; she suffered from audio/visual hallucinations and chronic suicidal ideation without intent/plan; her judgment and insight were fair/limited; and she had poor remote memory and some trauma-related memory problems. AR 1246-47. On December 1, her mood was depressed; her affect was dysphoric; she reported audio/visual hallucinations; and her insight was limited. AR 1240. On January 5, 2017, her speech was spontaneous, anxious tone, accented but otherwise within normal limits; she again reported audio/visual hallucinations and chronic suicidal ideation without intent or plan; her remote memory was again poor with trauma-related memory problems; and she was anxious and easily tearful but her mood and affect were otherwise full and congruent. AR 1590-91. On February 13, her thought process involved some anxious themes but was overall linear; she again had trauma-related auditory hallucinations and intermittent suicidal ideation without intent/plan; her judgment and insight were fair/limited; her remote memory was again poor with trauma-related memory problems; and she was anxious but less so today and less labile, and her mood and affect were otherwise full and congruent. AR 1583-84.

[11] "High" is an option on the checkboxes Dr. Sharon used.

1268 (February 4, 2016 visit); AR 1256 (August 25, 2016 visit); AR 1243 (September 8, 2016 visit); AR 1242 (December 1, 2016 visit); AR 1593 (January 5, 2017 visit); AR 1586 (February 13, 2017 visit). To the extent Ms. Lean's argument is based on an incorrect description of the record, the Court rejects it.

Ms. Lean also unpersuasively argues that her "occasional symptom improvement . . . is not indicative of a finding of non-disability." Doc. 21 at 13. She cites no legal authority in support of this contention. Instead, she contends that "Dr. Sharon's MSE findings describe florid psychotic behavior." *Id.* However, the Court's review of the record indicates that Dr. Camellia Clark, not Dr. Sharon, described Ms. Lean's psychotic behavior as being "florid."[12] AR 680. Dr. Clark also assessed Ms. Lean as having marked limitations in social interaction, as Ms. Lean emphasizes in her brief. Doc. 21 at 13. But Dr. Clark is a consultative examiner whose opinion the ALJ gave "diminished weight" for reasons the Court affirms later in this opinion. Again, because Ms. Lean's argument is based on an incorrect description of the record (attributing Dr. Clark's assessment to Dr. Sharon), the Court rejects her argument.

Finally, Ms. Lean states that "[t]he ALJ did not describe any evidence contrary to Dr. Sharon's GAF opinion." Doc. 21 at 13-14. This is simply not accurate. The ALJ described and evaluated three categories of evidence that he found to be inconsistent with a GAF below 50: (1) claimant's report of improvement in symptoms with treatment (AR 24-25); (2) the various mental status examination findings of record (AR 25-27); and (3) the no-more-than-"moderate" limitations in the four domains of functioning (AR 17-18). In his weighing of the GAF score, the ALJ explained that this evidence was already discussed and he did not need to repeat it. AR 27.

---

[12] Ms. Lean provides a definition of the word "florid," but does not provide a record cite in support of her contention. *Id.* at 13 & n.9.

This was not error. *Webb v. Comm'r, Soc. Sec. Admin.*, 750 F. App'x 718, 721 (10th Cir. 2018) ("While Mr. Webb takes issue with the ALJ's general reference to medical records 'all discussed above,' in this case it is not difficult to determine what inconsistencies the ALJ relied upon." (citation omitted)); *Endriss v. Astrue*, 506 F. App'x 772, 777 (10th Cir. 2012) ("The ALJ set forth a summary of the relevant objective medical evidence earlier in his decision and he is not required to continue to recite the same evidence again in rejecting Dr. Wright's opinion."). For all of the above reasons, Ms. Lean identifies no error in the ALJ's consideration of the GAF score assigned to Ms. Lean.

2.     <u>Don Smith, MPA, treating counselor</u>

Ms. Lean argues that the ALJ should have credited the opinion of Don Smith, her treating counselor. Doc. 21 at 14-15. On May 15, 2015, Don Smith, MPA, Licensed Alcohol and Drug Abuse Counselor, wrote a letter opinion in which he addressed Ms. Lean's mental functioning. The letter states in relevant part:

> Ernest Lean is a member of Agave Health who is diagnosed with PTSD; Anxiety Disorder and Major Depression. Currently, he is receiving psychiatric assistance, individual therapy and is prescribed psychotrophic [sic] medications. He is currently homeless and experiencing extreme trauma in the past. He has a history of sexual abuse, was assaulted physically by his ex-mate and had been abused by family members when he lived in the far east Asia.

> Mr. Lean has problems concentrating/remembering, has extreme problems being around others and isolates himself. His PTSD will trigger at any time and it will cause him to become anxious. He has a disability that limits his functioning and ability to earn a living.

AR 885. The ALJ gave "diminished weight" to this opinion. AR 27. The ALJ found that it is "inconsistent with the objective mental status examination findings and the claimant's own reports." *Id.* "For example, the claimant reported being independent in her instrumental activities of daily living, and reported that she went to a casino with friends in November 2016. Though

she was noted to have, on occasions, fair concentration and poor memory, she exhibited normal findings in those areas on multiple other occasions." *Id.*

Ms. Lean argues that Counselor Smith's opinion is consistent with Dr. Clark's mental status evaluations and Ms. Lean's own reports. Doc. 21 at 14-15. While it is true that Counselor Smith's opinion is consistent with some mental status evaluations, the ALJ is correct that it is inconsistent with others. The ALJ did not simply ignore evidence contrary to Counselor Smith's opinion; rather, he discussed and weighed it all, with appropriate citations to the record. AR 25-26. The ALJ began by acknowledging that "[o]n mental status examination, [Ms. Lean] often exhibited diminished mood and affect." AR 26 (citing AR 577[13]; AR 593[14]; AR 821[15]; AR 1078[16]; AR 871-72[17]; and AR 900[18]). "On other occasions throughout the record," the ALJ continued, "she exhibited appropriate mood and affect." *Id.* (citing AR 715[19]; AR 846[20]; AR 1107[21]; AR 1265[22]; and AR 1533[23]). "As noted above, when discussing domains of functioning, she exhibited deficits in insight and judgment, attention and concentration, and memory.

---

[13] April 23, 2014 exam reflecting a "dysphoric" mood and "flat" affect.

[14] May 21, 2014 exam reflecting an "anxious" mood.

[15] October 9, 2014 exam reflecting a "depressed" mood and "restricted" affect.

[16] January 9, 2015 exam reflecting a "restricted affect" that was "[c]ongruent with [his] mood."

[17] January 14, 2015 exam reflecting a mood ranging from euthymic to anxious and an affect that was "reactive and mood congruent."

[18] February 23, 2015 exam reflecting an "anxious" mood.

[19] August 28, 2014 note indicating her mood was "good" and her affect "neutral."

[20] December 15, 2014 note indicating her mood and affect were "appropriate."

[21] November 27, 2015 note indicating her mood and affect were "appropriate."

[22] February 4, 2016 note indicating "normal"—*i.e.*, "euthymic, full, congruent"—mood and affect.

[23] February 22, 2017 note indicating her mood and affect were "appropriate."

However, she also exhibited normal findings on other occasions." *Id.* (citing AR 846[24]). "On a

few occasions, she was tearful when discussing her history." *Id.* (citing AR 1073 & 1257). The

ALJ concluded:

> Apart from these, she was otherwise within normal limits at baseline on mental
> status examination, with within normal limits speech, thought content, and
> thought process. She was alert and fully oriented, and had no psychomotor
> agitation or retardation. She has also been entirely within normal limits on recent
> mental status examinations. For example, on January 27, 2017 visit with Mr.
> Lujan, she denied mental complaints on review of systems and exhibited
> appropriate mood and affect.

AR 26 (citations omitted). Nor does Ms. Lean deny engaging in the social activities the ALJ

cited. She does not specifically dispute either that she is "independent in her instrumental

activities of daily living" or that she "went to a casino with friends in November 2016." *Id.*

In sum, the ALJ cited "more than a mere scintilla" of evidence in support of his

evaluation. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Ms. Lean's citation to

conflicting evidence is not probative: the ALJ did not ignore or misrepresent such evidence.

Instead, he discussed it and considered it together with all evidence on the record. On appeal, this

Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'"

*Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). Based on the more-than-a-mere-

scintilla of evidence that supports the ALJ's treatment of Counselor Smith's assessment, the

Court finds no error in that assessment.

### 3. Camellia Clark, M.D., consultative examiner

Ms. Lean challenges the ALJ's treatment of the opinion of Dr. Camelia Clark,

consultative examiner, with respect to Ms. Lean's social functioning. Doc. 21 at 17-18. In

---

[24] December 15, 2014 note indicating she was cooperative, had an appropriate mood and affect
and normal judgment and was non-suicidal.

August 2014, consulting psychiatrist Camellia Clark, M.D., performed a consultative "Adult

Psychiatric Evaluation" of Ms. Lean. AR 679-81. Dr. Clark interviewed Ms. Lean, performed a

mental status examination, issued a diagnostic impression, and stated her opinion on Ms. Lean's

nonexertional limitations. *Id.* As part of the mental status examination, Dr. Clark found that

"[s]ocial interaction with this evaluator was normal." AR 680. With respect to Ms. Lean's

attention and memory, Dr. Clark stated:

> The claimant was oriented to the month, date, year, and city of the evaluation. The claimant was able to complete serial threes with speed and accuracy. The claimant was able to spell his name backwards correctly. The claimant was not easily distracted and needed no structure from this evaluator during the evaluation. Memory was intact for autobiographical information. The claimant was able to recall two out of three items after five minutes.

*Id.* Ms. Lean's judgment and insight was intact. *Id.* "The claimant described his mood as

'anxious.'" *Id.* "Affect was observed as being constricted and congruent." *Id.* "The claimant has

a history of suicidal ideation two weeks ago, but none now . . . ." *Id.* "The claimant's thought

processes were logical and goal-directed." *Id.* "He reports hearing voices for several years, but

does not know the exact onset." *Id.* "He also endorses a history of paranoia." *Id.* "Based on the

current paranoia, the claimant was exhibiting florid psychotic behavior during today's

interview." *Id.*

Dr. Clark discussed Ms. Lean's current level of functioning, according to her own

reports:

> The claimant is able to take care of personal hygiene. The claimant knows how to take care of all chores necessary to live independently. The claimant's hobbies include: TV. The claimant is able to utilize public transportation independently. The claimant handles his own funds.

*Id.* Dr. Clark assessed her GAF at 55. AR 681. In nonexertional functioning, Dr. Clark found that

Ms. Lean's limitation in her "[a]bility to socially interact with others at an age-appropriate level,

as demonstrated with this evaluator" is "marked, based on ongoing paranoia." *Id.* (emphasis removed). She did not find any other limits in Ms. Lean's nonexertional functioning. *Id.*

The ALJ accurately described this opinion, AR 25, and gave it "diminished" weight, AR 27. The ALJ "acknowledge[d] that Dr. Clark is a board certified psychiatrist who had the opportunity to directly examine the claimant." AR 27-28. But the ALJ found the opinion contradictory because Dr. Clark "stated she based the marked limitation in social interaction on 'ongoing paranoia . . . as demonstrated' on examination." AR 28. "However, she also found that the claimant's social interaction with her was normal." *Id.* The ALJ also found the marked limitation "inconsistent with the claimant's reports of being able to shop, take public transportation, and go to public places such as a casino, as well as her observed pleasant, cooperative interactions with multiple providers." *Id.* Thus, the ALJ justified, with citation to other evidence in the record, the weight he gave to Dr. Clark's opinion.

Ms. Lean argues that Dr. Clark's "clinical findings" support the marked limitation and so the ALJ should not have disregarded it. Doc. 21 at 18. But asking whether some evidence might have supported a different finding is the wrong question. Instead, this Court reviews whether the ALJ gave "specific and legitimate" reasons, supported by substantial evidence, for the weight he accorded Dr. Clark's opinion. Ms. Lean does not dispute that the ALJ gave specific reasons, and she does not really dispute the legitimacy of the reasons. For example, she does not argue that she cannot perform the cited activities of daily living or dispute that Dr. Clark found her ability to interact socially during the examination to be normal. The ALJ is "free to resolve evidentiary conflicts" where "there is substantial evidence to support his conclusion." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1172 (10th Cir. 2012). Courts "review only the *sufficiency* of the evidence, not its weight . . . ." *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007).

"Although the evidence may also have supported contrary findings, we may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Id.* at 1257-58 (internal quotation marks and alterations omitted). Nor does Ms. Lean cite any authority showing that the ALJ's reasons were illegitimate. The Court therefore finds that the ALJ properly explained his reasons for giving Dr. Clark's opinion on social functioning diminished weight and that substantial evidence supports this decision.

4. Lucas Lujan, PA, treating physician assistant

Ms. Lean argues that the ALJ should have credited the opinion of Lucas Lujan, PA, a treating physician assistant. Doc. 21 at 19-20. On December 15, 2016, Lucas Lujan, PA, entered a "Final Report" as a clinic note stating in relevant part:

> Mr. Ernest Lean is a patient of mine. He currently suffers from PTSD, depression, anxiety, chronic pain, diabetes, and chronic pain. I have been following him for several years. Many of these conditions have impaired his ability to perform daily functions appropriately. He is currently being followed by several specialists on a regular basis. Please take this into consideration.

AR 1015. The ALJ gave "little weight" to this opinion. AR 26.

> Though Mr. Lujan is the claimant's primary care provider, he provided no findings to support his opinion, and the limitations opined are not only inconsistent with the fact that he almost always found the claimant to be entirely within normal limits on examination, and noted at different times that all of the enumerated conditions were stable, but are also inconsistent with the claimant's own reports as to her instrumental activities of daily living.

*Id.*

Ms. Lean, again, does not dispute that the ALJ gave "specific" reasons for discounting this opinion. Doc. 21 at 19. She instead claims that the ALJ failed to assess the opinion according to the proper regulatory factors. *Id.* But this is not true. The ALJ considered both "(3) the degree to which the physician's opinion is supported by relevant evidence," and "(4) consistency

between the opinion and the record as a whole." *See Oldham v. Astrue*, 509 F.3d 1254, 1259 (10th Cir. 2007) (quoting the regulatory factors). He found the opinion was not supported and not consistent. AR 26. The ALJ is not required to "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham*, 509 F.3d at 1258. The decision need only be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (internal quotation marks omitted). The ALJ's explanation was properly specific.

Ms. Lean next argues that "ALJ Bentley claimed PA Lujan's reports provided no evidence for his opinions, and consistently found Ms. Lean to be within normal limits with stable conditions." Doc. 21 at 19. She contends that this is incorrect because PA Lujan's treatment notes "show repeated complaints of headaches, back pain, anxiety, depression and PTSD, and regularly documented follow-up examinations for the same issues." Doc. 21 at 19. This does not establish that the ALJ misrepresented PA Lujan's opinion. While PA Lujan's treatment notes certainly do document *Ms. Lean's complaints*, the ALJ is correct that PA Lujan's *medical examinations* find Ms. Lean "to be entirely within normal limits." AR 26. This is true even of the record relied on by Ms. Lean in her motion. *See* Doc. 21 at 19 (citing AR 845-53[25]).

Ms. Lean also argues PA Lujan's opinion is consistent with his treatment notes because he noted "objective symptoms" of "pain with palpation, difficulty with heel and toe walking,

---

[25] December 15, 2014 note indicating: "General: Alert and oriented, No acute distress. Eye: Pupils are equal, round and reactive to light, Extraocular movements are intact. HENT: Normocephalic. Neck: Supple. Respiratory: Lungs are clear to auscultation, Respirations are non-labored. Cardiovascular: Normal rate, Regular rhythm, No murmur. Musculoskeletal: Normal range of motion. Integumentary: Warm. Dry, Pink, Intact, No pallor, No rash. Neurologic: Alert, Oriented, Normal sensory. Psychiatric: Cooperative, Appropriate mood & affect, Normal judgment, Non-suicidal."

walks with a limp, and referral for imaging that showed disc degeneration and protrusion at L4-5." Doc. 21 at 19 (citing AR 937-38[26]; AR 954[27]; and AR 957[28]). Again, Ms. Lean merely points out some evidence which could have supported a different conclusion. The Court disagrees with Ms. Lean that this evidence was either misrepresented or not considered by the ALJ. The ALJ specifically acknowledged the December 22, 2015 radiology results that showed "degenerative changes of the disc at L4-5 and LSSI," but found that "the images showed no significant stenosis, nerve impingement, or disc herniation." AR 22 (citing AR 1011[29]; AR 1063[30]; AR 1112[31]; AR 1098[32]; and AR 998[33]). The ALJ also acknowledged PA Lujan's observation that Ms. Lean "walked with a limp," but went on to find that "Mr. Lujan almost always found the claimant to be entirely within normal limits on examination." *Id.* (citing AR 832[34]; and AR

---

[26] Radiology findings on December 22, 2015 of disc degeneration and protrusion.

[27] October 29, 2015 note from PA Lujan observing: "Normal range of motion, Normal strength, No tenderness, No swelling, No deformity, walks with mild limp, no atrophy noted on exam. [F]ull wt bearing."

[28] October 5, 2015 note from PA Lujan observing: "Normal range of motion, Normal strength, No tenderness, No swelling, No deformity, Normal gait, no atrophy noted of lower ext. full wt bearing. gait wnl. spine no mid line tenderness>> some lat muscle pain to palp. no s/s infection/ no swelling. ant flex wnl. heel toe walking with some diff due to pain in the leg. no atrophy noted on exam. DTR's wnl bilat."

[29] July 2016 results showing "mild to moderate degenerative changes" in the lower spine "with minimal convexity" of the upper spine.

[30] December 2015 results showing: "No spinal canal stenosis."

[31] October 2015 results showing: "Five lumbar type vertebrae are intact, maintain normal, alignment, and have preserved intervertebral disc spaces. Mild degenerative facet arthrosis at L5-S1."

[32] PA Lujan's notes acknowledging in January 2016 that "MRI did not note spinal stenosis or other nerve findings."

[33] October 2016 note from Dr. Malizzo indicating: "No significant stenosis, nerve impingement, or disc herniation was identified."

[34] November 2014 treatment note from PA Lujan reflecting normal physical exam.

1197[35]). "Apart from the findings noted above, the claimant was found to have normal/intact gait." *Id.* "She had normal range of motion and strength, and no tenderness or atrophy was noted." AR 22-23. "Her cranial nerves were grossly intact and she had normal deep tendon reflexes." AR 23. "She had no focal neurological deficits, and had normal sensory and coordination." *Id.* (citing AR 675[36]; AR 699[37]; AR 1073[38]; AR 1100[39]; AR 1110[40]; and AR 1548[41]).

In sum, the ALJ reviewed all the evidence and weighed it. He came to the conclusion that the opinion of PA Lujan deserved little weight. He did not ignore any relevant evidence or mischaracterize the evidence in his findings. His role is to reach conclusions based on conflicting evidence. *Keyes-Zachary*, 695 F.3d at 1172; *Oldham*, 509 F.3d at 1257-58. The Court finds the ALJ committed no error in fulfilling this role.

## II.     The ALJ Did Not Err At Step Five.

At step 5, the burden shifts to the Commissioner to prove that the claimant can perform other work existing in significant numbers in the national economy. *Raymond v. Astrue*, 621 F.3d 1269, 1274 (10th Cir. 2009). Ms. Lean argues that the Commissioner did not meet this burden because the ALJ failed to resolve a conflict between the VE testimony and the Dictionary of Occupational Titles ("DOT"). Doc. 21 at 21-22. Relying on *Hackett v. Barnhart*, 395 F.3d 1168

---

[35] November 2016 outpatient note from PA Lujan reflecting normal physical exam.

[36] Normal physical exam in May 2014 by NP Miller, noting some muscle spasms.

[37] Normal physical exam in August 2014 by Dr. Baker.

[38] Normal physical exam, except for some trace non-pitting edema, in December 2016 by Dr. Burge.

[39] Normal physical exam in January 2016 by PA Lujan.

[40] Normal physical exam, except for "walks with mild limp," in October 2015 by PA Lujan.

[41] Normal physical exam in February 2017 by UNM Emergency Department.

(10th Cir. 2005), Ms. Lean argues that the ALJ failed to reconcile inconsistences between his own finding that Ms. Lean is able to "carry out simple and detailed, but not complex, tasks," AR 18, and the VE's testimony that Ms. Lean could perform a job existing in significant numbers that, according to the DOT, requires a reasoning level of three; *i.e.*, mail clerk, AR 29. Doc. 18 at 19-22; *see* DOT # 209.687-026, Mail Clerk, 1991 WL 671813.

The Dictionary of Occupational Titles classifies each job according to its required "General Educational Development" ("GED"). This classification "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." DOT, Components of the Definitional Trailer, Appx. C, § III, 1991 WL 688702. "The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development." *Id.* The "reasoning" scale runs from one to six, with six signaling jobs that call for the most complex reasoning. The first three reasoning levels are described as:

- LEVEL 1: Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

- LEVEL 2: Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

- LEVEL 3: Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

DOT, Appx. C, § III, 1991 WL 688702.

The Tenth Circuit has held that "an ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony before the ALJ may rely on the expert testimony as substantial evidence to support a determination of nondisability." *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999). After the Tenth Circuit's holding in

*Haddock*, the Social Security Administration promulgated Social Security Ruling ("SSR") 00-4p

and further clarified the ALJ's affirmative responsibility to ask about such conflicts. SSR 00-4p

instructs that

> [w]hen vocational evidence provided by a VE or VS is not consistent with
> information in the DOT, the [ALJ] must resolve this conflict before relying on the
> VE or VS evidence to support a determination or decision that the individual is or
> is not disabled. The [ALJ] will explain in the determination or decision how he or
> she resolved the conflict. The [ALJ] must explain the resolution of the conflict
> irrespective of how the conflict was identified.

2000 WL 1898704, at *4. The VE in this case testified that an individual with Ms. Lean's RFC

could perform the job of mail clerk, and that her testimony is consistent with the DOT. AR 120-

21.

Ms. Lean argues that the ALJ's limitation to "simple and detailed, but not complex,

tasks" means she cannot perform jobs (such as mail clerk) that require a reasoning level of three.

In support, she relies on *Hackett v. Barnhart*, 395 F.3d 1168 (10th Cir. 2005), in which the Tenth

Circuit found that a limitation to "simple routine work tasks" is inconsistent with jobs requiring

level three reasoning and suggested that it is more consistent with jobs requiring level two

reasoning. 395 F.3d at 1176. In so doing, the Tenth Circuit agreed with the claimant that there

was an apparent conflict between a claimant's inability to perform more than simple and

repetitive tasks and the level three reasoning required by the jobs identified. *Id.* It held that an

ALJ may not conclude that a claimant who is restricted to "simple and routine work tasks" can

perform a reasoning-level-three job without addressing this conflict. *Id.*

The claimant in *Hackett*, however, could perform only "simple *routine* work tasks." 395

F.3d at 1176 (emphasis added). That the claimant could only perform tasks that were "routine"

was important in *Hackett* because the relevant difference between level two and level three

reasoning was the difference in being able to deal with problems involving *a few* concrete

variables (level two) as opposed to problems involving *several* concrete variables (level three).

*Id*. A limitation to "routine" directly relates to how much variety a claimant can handle, and so

the limitation to "routine" was crucial in *Hackett*. In contrast to *Hackett*, the ALJ here did not

limit Ms. Lean to "routine" tasks. Thus, the limitation crucial to the outcome in *Hackett* does not

exist in the present case. While the ALJ here did also determine that Ms. Lean could not perform

"complex" tasks, Ms. Lean fails to establish that a limitation to "simple . . . but not complex

tasks" precludes her from performing jobs with a reasoning level of three. In other words,

because the ALJ did not limit Ms. Lean to "routine" tasks, *Hackett* does not control the outcome

in the present case.

　　　Moreover, independent of *Hackett*, this Court find no conflict between the VE's

testimony and the DOT. The reasoning development scale does not necessarily reflect the *skill*

level required of a job. The skill level is measured by the SVP,[42] whereas the reasoning

development scale measures the educational *background* required of a position. *See Anderson v.*

*Colvin*, 514 F. App'x 756, 764 (10th Cir. 2013) ("GED does not describe specific mental or skill

requirements of a particular job, but rather describes the general educational background that

makes an individual suitable for the job, broken into the divisions of Reasoning Development,

Mathematical Development and Language Development."); *Mounts v. Astrue*, 479 F. App'x 860,

868 (10th Cir. 2012) ("Job descriptions in the Dictionary of Occupational Titles contain several

---

[42] SVP stands for "specific vocational preparation" and "refers to the 'time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Vigil v. Colvin*, 805 F.3d 1199, 1201 n.2 (10th Cir. 2015) (quoting the Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991), 1991 WL 688702 (G.P.O.)). "A job at SVP one requires 'a short demonstration only' and at SVP two requires 'anything beyond a short demonstration up to and including 1 month.'" *Id.* "[U]nskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." SSR 00-4p, 2000 WL 1898704, at *3.

elements required to perform a specific job, including a claimant's GED, which is the level of formal and informal education required to perform a specific job. There is no genuine dispute that Mounts retained the GED to perform the jobs as an appointment clerk, escort vehicle driver, or dispatcher, as testified to by the VE."); *Sandoval v. Barnhart*, 209 F. App'x 820, 825 (10th Cir. 2006) ("[t]he adequacy of Ms. Sandoval's educational development is not in dispute"). Ms. Lean does not argue that her educational background renders her unsuitable for the job of mail clerk.

The Court concludes that the VE's identification of a reasoning-level-three job was not in conflict with the DOT or Ms. Lean's RFC.

## III.    The Appeals Council Did Not Err.

Ms. Lean argues that the Appeals Council should have considered the additional medical evidence submitted during Ms. Lean's request for review. Doc. 21 at 23-27. Whether evidence qualifies for consideration by the Appeals Council is a question of law subject to *de novo* review. *Krauser v. Astrue*, 638 F.3d 1324, 1328 (10th Cir. 2011) (citing *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003)). The "general rule of *de novo* review permits [the Court] to resolve the matter and remand if the Appeals Council erroneously rejected the evidence." *Id.* (citing *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004)). Additional evidence should be considered only if it is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision. 20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5). Evidence is new "if it is not duplicative or cumulative" and material "if there is a reasonable possibility that it would have changed the outcome." *Threet*, 353 F.3d at 1191. Evidence is chronologically pertinent if it relates to the time period adjudicated by the ALJ; *i.e.*, the period on or before the date of the

ALJ's decision. *Chambers*, 389 F.3d at 1142. The Court addresses all three criteria as part of its *de novo* review.

Section 404.970 was recently amended. *See* Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process, 81 Fed. Reg. 90,987, 2016 WL 7242991 (Dec. 16, 2016) (effective January 17, 2017, with compliance required after May 1, 2017). The amendments changed the materiality standard from one of "reasonable *possibility*," *Threet*, 353 F.3d at 1191 (emphasis added), to whether there is a "reasonable *probability* that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5) (emphasis added). The amendment also added that the Appeals Council will only consider additional evidence if the claimant shows good cause for not informing the ALJ about the new evidence and submitting it to him or her. *Id.* § 404.970(b).

The parties have not raised or briefed the issue of whether the current regulation applies to the Appeals Council order in this case, which is dated April 21, 2018. AR 1. The Appeals Council explained that it applies "the laws, regulations and rulings in effect as of the date we took this action." AR at 1. Ms. Lean argues, without acknowledging this amendment to the regulation, that the Appeals Council should have applied the "reasonable possibility" standard. Doc. 27 at 24. The Court does not need to determine which standard should apply (or whether a significant difference exists between the two standards), because it finds the newly submitted evidence does not qualify for consideration on other grounds.

The Appeals Council divided Ms. Lean's newly submitted evidence into two categories: (1) "medical records from Davita Medical Group, dated July 9, 2016 to December 28, 2016 (44 pages)"; and (2) "records from Davita Medical Group, dated May 19, 2017 to July 5, 2017 (18 pages)." AR 2. With respect to the first category, it found that "this evidence does not show a

reasonable probability that it would change the outcome of the decision. We did not consider and exhibit this evidence." *Id.* With respect to the second, it found that the "additional evidence does not relate to the period at issue" because the ALJ decision issued on May 17, 2017. *Id.* Ms. Lean argues that the Appeals Council erred with respect to both categories.

First, Ms. Lean argues that the records from July 9, 2016 to December 28, 2016 (the "2016 records") contain "the following notes and observations" that are new, in that they are not duplicative or cumulative:

- December 28, 2016: Dr. Katrine Mitchell, D.P.M., assessed that Ms. Lean had "[l]umbosacral spondylosis without myelopathy" that is "[c]hronic and severe." She also assessed Ms. Lean with "[l]umbar degenerative disc disease" that is "[c]hronic." Dr. Mitchell indicated that she would schedule bilateral L4-L5 and L5-S1 facet injections at the next available appointment. AR 64.

- At the same appointment, Ms. Lean reported that she "received no significant relief" from "his first lumbar epidural steroid injection at L5-S1 on October 18." He reported his pain on that day as "focused in his low back" and described it as "sharp, achy and constant." Ms. Lean reported that standing for 30 minutes or more increases his back pain, which was 7/10 on the day of the appointment.

Doc. 21 at 24-25.

As the Commissioner points out, however, this evidence relates to the same conditions that the ALJ discussed. Doc. 22 at 20. It is both duplicative and cumulative. For instance, Dr. Mitchell's assessment is identical to assessments in the record already before the ALJ. *See*, *e.g.*, AR 996-99 (October 18, 2016 assessment by Dr. Malizzo that Ms. Lean suffers from with "Lumbar degenerative disc disease" and "Lumbosacral spondylosis without myelopathy"). Further, Ms. Lean herself documents that she repeatedly complained of lower back pain and pain while standing between 2013 and May 17, 2017. Doc. 21 at 4-8 (citing AR 515, 674, 580, 624-26, 964-66, 953-55, 950-52, 937-38, 932-35, 914-17, 904, 902-03, 894-96, and 1146-48). There is nothing new in the DaVita 2016 records that was not already submitted for the ALJ's consideration.

The 2017 records are similarly cumulative. As Ms. Lean highlights in her motion, the record already contains evidence that Ms. Lean has back pain, exactly like the records submitted to the Appeals Council. *Compare* Doc. 21 at 4-8 (highlighting existing evidence in the record of her back pain), *with id.* at 26 (discussing the 2017 records from Dr. Merhege that Ms. Lean receives steroid injections without significant relief because of her right-side lower back pain and suffers from lumbosacral spondylosis without myelopathy), *and id.* at 26-27 (discussing 2017 treatment records from Dr. Mitchell that "contain complaints and diagnoses *as found in other treatment providers' records*" (emphasis added)). As Ms. Lean explains, the newly submitted evidence also relates to "Ms. Lean's foot deformity and hallux abductovalgus deformity." *Id.* (citing AR 54, 57). This is duplicative of the medical evidence submitted to the ALJ reflecting the same impairments. *E.g.*, AR 731 (September 10, 2014 x-rays showing "marked hallux valgus deformity"); AR 992 (September 27, 2016 treatment note documenting Ms. Lean's foot deformities).

Because the evidence is not new, the Court need not reach Ms. Lean's contention that it is material and chronologically pertinent. 20 C.F.R. § 404.970(a)(5) (Appeals Council will review a case if it receives evidence that is "new, material, and relates to the period on or before the date of the hearing decision, *and* there is a reasonable probability that the additional evidence would change the outcome of the decision" (emphasis added)). The Appeals Council was correct to refuse to consider it.

## Conclusion

For the reasons stated above, Ms. Lean's Motion to Reverse and Remand for a Rehearing With Supporting Memorandum, Doc. 19, is **DENIED**.

**STEVEN C. YARBROUGH**
**United States Magistrate Judge**
**Presiding by Consent**